IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| **Refco Public Commodity Pool, L.P.,**[1] | Case No. 14-11216 (BLS) |
| Debtor. | Re: Docket Nos. 292, 420, & 430 |

## OPINION[2]

MAA, LLC, the plan administrator for the confirmed plan of Refco Public

Commodity Pool, L.P., (the "Debtor") asks this Court to disallow the amended proof of

claim (the "Claim")[3] filed by the Internal Revenue Service (the "IRS") and determine that

the Debtor owes no tax or penalty under applicable tax law and Bankruptcy Code

sections 505(a) and 502(b)(1).  It is undisputed that that the Debtor failed to file its tax

returns for the years 2006 to 2008; and that for such failure, the Debtor incurred penalties

totaling $3,662,000.  The question before the Court is whether these penalties should be

waived under Internal Revenue Code ("IRC") sections 6724(a) and 6698(a)(1) because

the Debtor's failure to file was due to reasonable cause and not willful neglect.  For the

reasons set forth below, the Court holds that the penalties should be excused and will

disallow the Claim.

## I.  BACKGROUND

The Debtor formed in 2003 as a partnership to track the performance of the

Standard & Poor's Managed Futures Index.  The Debtor invested substantially all of its

assets in SPhinX Managed Futures Fund, SPC ("SMFF"), a Cayman Islands domiciled

---

[1] Formerly known as Managed Futures Index Fund, L.P.
[2] This Opinion constitutes the Court's findings of fact and conclusions of law, as required by the Federal Rules of Bankruptcy Procedure.  *See* Fed. R. Bankr. P. 7052, 9014(c).
[3] Claim No. 1002.

segregated portfolio company that was part of a group of affiliated companies knows as the SPhinX Group.  SMFF used Refco, LLC as its regulated futures commission merchant to execute futures and other trades; and maintained assets in excess of its required margin with Refco Capital Markets, Ltd.  In late 2005, the Debtor was placed *in extremis* when these Refco entities, along with certain affiliates, ("Refco") filed for bankruptcy, and shortly thereafter, the SPhinX Group, including SMFF, filed for liquidation in the Grand Court of the Cayman Islands.

### A.  Refco Bankruptcy

In October 2005, Refco filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the U.S. Bankruptcy Court for the Southern District of New York. (The Debtor was not among the Refco entities that filed for bankruptcy in 2005.)  The primary event precipitating the filing was the announcement that Refco had discovered a sizable undisclosed related party receivable.  Almost immediately, Refco was in the throes of a liquidity crisis as investors began withdrawing their funds.  Among these investors was SMFF, which shortly before Refco filed bankruptcy, withdrew approximately $312 million.

In December 2005, a $312 million avoidance action under Bankruptcy Code section 547 was filed against SMFF.  On the same day this action was filed, the bankruptcy court froze SMFF's assets.  SMFF eventually settled this preference action for $260 million (the "Preference Settlement").

### B.  SPhinX Group Liquidation and Chapter 15 Filing

In December 2005, the Debtor sought to redeem its entire investment in SMFF. Instead of honoring this request, SMFF issued the Debtor "special situation shares" ("S

- 2 -

Shares").  The S Shares were illiquid and in alleged satisfactions of SMFF's obligation to honor the Debtor's redemption request.  Other than the S Shares, the Debtor had no material assets.

In June 2006, the SPhinX Group, including SMFF, voluntarily placed itself into liquidation in the Grand Court of the Cayman Islands (the "Grand Court").  The Grand Court appointed Kenneth Krys and Christopher Stride as the joint official liquidators (the "Liquidators") and ordered the winding up of each of the funds in the SPhinX Group.  In July 2006, the Liquidators filed for recognition under Chapter 15 of the Bankruptcy Code in the U.S. Bankruptcy Court for the Southern District of New York.

Early on in the liquidation proceeding, the Liquidators uncovered serious accounting issues.  In 2006, the Liquidators advised the Debtor and other investors in the SPhinX Group that the accounting work performed by Derivatives Portfolio Management LLC ("DPM"), the SPhinX Group's administrator responsible for maintaining the accounting records, was inaccurate and incomplete.  Of note, certain DPM prepared spreadsheets that detailed the year-to-date change in net asset values among the SPhinX Group funds (hereinafter, the "NAVINC Files") contained serious deficiencies.  In an affidavit submitted to the Grand Court on June 20, 2007, Mr. Krys discussed a host of significant accounting issues: extensive co-mingling of funds; misstatements of cash; failure to process redemptions; inadequate documentation of transactions within the SPhinX Group; failure to properly allocate shares; two sets of books; and the net asset value calculations not accounting for the Preference Settlement.  Due to these issues and others, the Liquidators advised investors that they could not give assurances regarding the accuracy of the net asset value calculations disseminated to investors since 2002.  The

Liquidators also began including strongly worded disclaimers warning against relying upon or using any financial reports regarding the SPhinX Group.

After 2005, SPhinX Group did not file Form 1065 with the IRS, or provide its investors with a Schedule K-1 (together, the "Partnership Returns").  In July 2011, the Liquidators filed a motion under Bankruptcy Code section 505 in its Chapter 15 proceeding seeking a determination that the SPhinX Group owed no penalties for not filing Partnership Returns for the years 2005 to 2007.  In a declaration submitted with the motion, Mr. Krys noted that the Liquidators would not be filing Partnership Returns for any year after 2005.  He explained that to prepare these returns would cost between $5 and $7 million because an accounting firm would have to reconstruct thousands of records.[4]  The IRS and the Liquidators settled the matter and SPhinX Group was absolved from having to file Partnership Returns for the years 2005 to 2007.

Before making distributions to investors, the Liquidators identified twenty-three issues (the "Liquidation Issues") they had to resolve.  These issues consisted of a broad range of disputes between various investors and creditor constituents.  The two more notable of these issues concerned the allocation of the Preference Settlement among the SPhinX Group funds and the treatment of the S Shares.

In November 2013, after many years of litigation and negotiation, the Grand Court approved the "Second Scheme of Arrangement."  In compliance with this scheme, the Liquidators made an initial distribution to investors in March 2014.  At that time, the

---

[4]  SPhinX Group's auditor, PriceWaterhouseCoopers ("PwC"), resigned in 2005 after identifying material weaknesses in the reconciliation and recording of cash and investments.  PwC declined to issue a clean audit opinion for 2005.  Mr. Krys tried to hire Anchin, Block & Anchin LLP to prepare the Partnership Returns, but the record reflects that it refused the engagement because SPhinX Group's records lacked sufficient detail.

Debtor received approximately 36% of the remaining net asset value of its investment in SMFF, which equated to approximately $11.5 million.

### C. The Debtor's Liquidation Proceeding and Chapter 11 Filing

In November 2006, Richard Butt, the President of Refco Fund Holdings, LLC, the Debtor's general partner, petitioned for the appointment of a liquidating trustee to oversee the Debtor in the Delaware Court of Chancery.  The Chancery Court appointed MAA, LLC as the liquidating trustee and authorized it to take control of the Debtor.  At the time MAA was appointed, the Debtor had approximately 1,600 investors and assets of approximately $39 million.

On May 13, 2014, the Debtor filed a voluntary Chapter 11 petition with this Court.  On the same date, the Debtor filed a disclosure statement and plan.[5]  On September 9, 2014, the Court confirmed the plan and appointed MAA as the plan administrator charged with liquidating the Debtor's remaining assets.  According to the Debtor's approved disclosure statement, its only material non-cash asset was its investment in SMFF.

On November 10, 2014, the IRS filed the Claim asserting a general unsecured claim of $4,112,000 for penalties stemming from not filing Partnership Returns for years 2005 through 2008.[6]  On January 20, 2015, the Debtor objected to the Claim (the "Objection") under IRC sections 6724(a) and 6698(a)(1) and Bankruptcy Code sections 505(a) and 502(b)(1).[7]  The IRS filed a response to which the Debtor replied.[8]  The Court

---

[5] D.I. 4 & 5.
[6] At the hearing on this matter, the IRS acknowledged that it received the Debtor's Partnership Returns for the 2005 tax year and agreed that the Claim should be amended to reflect that the IRS only seeks penalties for the years 2006 to 2008.
[7] D.I. 292.
[8] D.I. 420 & 430.

heard oral argument and testimony on June 16, 2016 (the "Trial") and took the matter

under advisement.  The matter has been fully briefed and is ripe for decision.

## II.   JURISDICTION AND VENUE

The Court has jurisdiction over this matter under 28 U.S.C. §§ 1334 and 157(a)

(b)(1).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

Consideration of this Objection constitutes a core proceeding under 28 U.S.C.

§ 157(b)(2)(B).

## III.   DISCUSSION

As part of the claims allowance process, bankruptcy courts may adjudicate a

debtor's tax liability. 11 U.S.C. § 502(a); *see* 11 U.S.C. § 505(a)(1) ("[T]he court may

determine the amount or legality of any tax, any fine, or penalty relating to a tax . . . .");

*In re Custom Distrib. Servs. Inc.*, 224 F.3d 235, 239-40 (3d Cir. 2000) (observing that

section 505(a) has consistently been "interpreted as a jurisdictional statute that confers on

the bankruptcy court authority to determine certain tax claims").  Section 502(a) sets

forth the basic framework of the claims-allowance process.  A claim filed under section

501 is deemed allowed unless a party in interest objects.  11 U.S.C. § 502(a).  A court

must allow a claim except to the extent that "such claim is unenforceable against the

debtor and property of the debtor, under any agreement or applicable law for a reason

other than because such claim is contingent or unmatured." *Id.* § 502(b).

If a claim is filed in accordance with section 501 and the Federal Rules of

Bankruptcy Procedure, it is "prima facie evidence of the validity and amount of the

claim." Fed. R. Bankr. P. 3001(f).  The prima facie validity of a claim may be rebutted

by an objector producing evidence "equal in force to the prima facie case." *In re*

- 6 -

*Allegheny Int' l, Inc.*, 954 F.2d 167, 173-74 (3d Cir. 1992).  If the objector produces

sufficient evidence to overcome the prima facie effect given to a proof of claim, the

burden usually reverts to the claimant "to prove the validity of the claim by a

preponderance of the evidence."  *Id.*  The burden does not shift, however, where

applicable substantive law provides otherwise.  *E.g.*, *Raleigh v. Illinois Dept. of Revenue*,

530 U.S. 15, 17 (2000) (holding that bankruptcy does not alter the burden of proof

imposed by applicable nonbankruptcy law because "the burden of proof is an essential

element of the claim itself; one who asserts a claim is entitled to the burden of proof that

normally comes with it"); *In re 1701 Commerce*, LLC, 511 B.R. 812, 822 (Bankr. N.D.

Tex. 2014) ("Once the objecting party has met this burden, [overcoming the prima facie

validity of a claim] the burden falls to the party that would have the burden of proof

respecting the claim in a non-bankruptcy context.") (citing *Raleigh*, 530 U.S. at 21).

Thus, if an objector produces sufficient evidence to rebut a claim, the substantive law

creating the underlying obligation controls who bears the ultimate burden of proof.  *See*

*In re Stone & Webster, Inc.*, 547 B.R. 588, 608 (Bankr. D. Del. 2016).

Under the IRC, a partnership is not taxed at the entity level.  I.R.C. § 701.  Even

though a partnership is a "pass through" entity and each partner is individually liable for

the income of the partnership, *id.* § 702(a); *United States v. Basye*, 410 U.S. 441, 448

(1973), it still is responsible for filing an information return.  Specifically, a partnership

must file a Form 1065, which reports items of gross income and allowable deductions.

I.R.C. § 6031(a).  Items that are reported on this form include "gains and losses from

sales or exchanges of capital assets," certain dividends, and "other items of income, gain,

loss, deduction, or credit."  *Id.* § 702(a).  A Schedule K-1 accompanies Form 1065 and

details a partnership's profit or loss among the partners. A partner uses this information to report its distributive share of the partnership items on its income tax returns. *Id.* §§ 701-704.

A partnership faces significant penalties for not filing its Partnership Returns. *Id.* §§ 6698(a), 6721(a). A taxpayer can obtain a waiver of these penalties if the failure to file was "due to reasonable cause and not due to willful neglect." *Id.* §§ 6724(a), § 6698(a)(1). The burden is on the partnership seeking waiver of the penalty. *Lefcourt v. United States*, 125 F.3d 79, 84 (2d Cir. 1997). Accordingly, to be excused from paying a penalty for failing to file, the Debtor must demonstrate that the (1) failure was due to "reasonable cause" and (2) the failure did not result from "willful neglect." *E. Wind Indus., Inc. v. United States*, 196 F.3d 499, 504-05 (3d Cir. 1999).

### A. "Reasonable Cause" Under IRC Section 6724(a)

The Debtor contends that "reasonable cause" exists for not filing its Partnership Returns. Although "reasonable cause" is not defined under the IRC, the Treasury Regulations sets forth what a taxpayer must show to establish reasonable cause: a filer must prove that either (1) the failure was due to impediments that were beyond the filer's control, or (2) there were significant mitigating factors with respect to the failure to file. Treas. Reg. § 301.6724-1(a)(2)(i)-(ii). In addition to satisfying one of these prongs, a filer must also establish that it acted in a responsible manner both before and after the failure to file occurred. *Id.* § 301.6724-1(a). Case law teaches that the threshold inquiry is whether, based on all the facts and circumstances, the taxpayer exercised ordinary business care and prudence, but was still unable to file a return within the prescribed time. *See, e.g.*, *Estate of Thouron v. United States*, 752 F.3d 311, 314 (3d Cir. 2014);

*Sanderling, Inc. v. C.I.R.*, 571 F.2d 174, 179 (3rd Cir. 1978).  The Debtor asserts that both impediments and mitigating factors existed excusing its failure to file.

### 1.  Impediments

The Debtor argues that it faced insurmountable impediments preparing its Partnership Returns.  Because the Debtor invested nearly all of its assets in SMFF, it depended on SMFF to supply it with a Schedule K-1.  The Debtor was unable to comply with its own filing obligations without this critical information.  Since 2005, SMFF has not filed Partnership Returns or provided a Schedule K-1 to the Debtor.  The Debtor contends that these events were beyond its control and qualify as impediments.

In response, the IRS asserts that the Debtor could have prepared its Partnership Returns without receiving a Schedule K-1 from SMFF.  The Debtor cannot establish reasonable cause when it did not seek to obtain the information necessary to file from another source.  The IRS contends that if the Debtor made reasonable efforts, it could have easily obtained the NAVINC Files and the unaudited Sphinx Funds Positions Liquidation Summary, as of December 31, 2006, and the unaudited Sphinx Funds Receipts & Disbursements Statement for the period June 30, 2006 to December 31, 2007, (together, the "Summary Financial Data").  The IRS argues that this information would have been sufficient to prepare the Debtor's Partnership Returns.

While acknowledging that it could have used this information, the Debtor stresses that this information was unreliable and inaccurate.  The Debtor contends that the record is replete with evidence showing it could not prepare reasonably accurate Partnership Returns with the NAVINC Files and Summary Financial Data.  In submissions with the Grand Court, the Liquidators highlighted fundamental problems with SPhinX Group's

accounting records.  The Debtor also asserts that it could not use the Summary Financial

Data to prepare its Partnership Returns because this information does not calculate the

income of the separate funds—a critical piece of information when preparing Form 1065.

Additionally, the Debtor contends that the Liquidation Issues created substantial

uncertainties regarding the Debtor's investment in SMFF.  The Debtor argues that two of

these issues—the allocation of the Preference Settlement and the scope of rights attaching

to the S Shares—created such uncertainty it could not prepare its Partnership Returns.

 Here, the record reflects that events transpired outside of the Debtor's control

such that it could not prepare reasonably accurate returns.  As discussed in greater detail

below, the Debtor was largely left at the whim of SMFF and its liquidation proceeding in

the Cayman Islands.  The Debtor invested nearly all of its money in SMFF and therefore

relied on SMFF to provide it with a Schedule K-1.  SMFF's Schedule K-1 provided

essential information to the Debtor because it detailed the Debtor's share of income,

deductions, and credits in SMFF.  But after 2005, SMFF stopped supplying the Debtor

with a Schedule K-1.  The reasons SMFF failed to supply such information arose from

events unrelated to the Debtor; namely, SMFF entering liquidation proceedings and the

Liquidators uncovering material inaccuracies in SPhinX Group's accounting records.

 While SMFF's foreign liquidation proceeding complicated the Debtor's ability to

obtain a Schedule K-1, the Liquidators' discoveries effectively prevented the Debtor from

preparing its returns.  The Liquidators found the SPhinX Group's books and records in

total disarray.  In submissions with the Grand Court, the Liquidators noted that SPhinX

Group's records could not be relied upon due to, *inter alia*, co-mingling of funds,

misstatements of cash and receivables, improper allocation of shares, failure to account

for the Preference Settlement, and the failure to process redemptions.  Moreover, the

Liquidators observed and concluded that SPhinX Group's accounting records, including

the NAVINC Files and Summary Financial Data, contained material inaccuracies.[9]

Further complicating the Debtor's ability to prepare its returns were the unresolved

Preference Settlement and S Share issues.  Until 2013, the Preference Settlement issue—

the allocation of the settlement among the SPhinX Group funds—remained unresolved,

which created substantial uncertainties over SMFF's allocation.  Similarly, from 2006

until 2013, the Liquidators advised the Grand Court on many occasions that treatment of

the S Shares remained so uncertain they were not even sure if they should be treated as

debt or equity.

　　　　These issues, which were entirely out of the Debtor's control, were particularly

acute for the Debtor.[10]  As an accrual method taxpayer, the Debtor cannot recognize

income until "all the events have occurred which fix the right to receive such income and

the amount thereof can be determined with reasonable accuracy."  Treas. Reg. §§ 1.451-

1(a), (c)(1)(ii).  With SMFF not providing Partnership Returns after 2005, the above-

noted events prevented the Debtor from determining whether it had a fixed right to

receive income from SMFF.  The documents available from SMFF were the NAVINC

Files and the Summary Financial Data, but this information was fraught with errors; and

with respect to the Summary Financial Data in particular, entirely unhelpful because it

only provided information on "receipts" and "proceeds" received, not "income."  Thus,

---

[9] Mr. Butt testified that he had serious concerns over the accuracy of the NAVINC Files because they did not account for the Preference Settlement.  The IRS similarly testified that the NAVINC Files and Summary Financial Data did not seem to contain a reference to the Preference Settlement.

[10] The Debtor could not extricate itself from the onslaught of issues facing SMFF given that it received S Shares in response to its redemption request.  The S Shares basically became a rope that tied the Debtor to SMFF's liquidation.

the Court concludes that the Debtor's failure to file its Partnership Returns arose from events beyond its control.

### 2. Mitigating factors

The Debtor also asserts that there are significant mitigating factors. The Debtor has a history of complying with the information reporting requirements required by the IRC. Before 2005, the Debtor never incurred tax penalties in connection with the failure to file.

A taxpayer may establish reasonable cause by showing that there are "significant mitigating factors with respect to the failure." Treas. Reg. § 301.6724-1(a)(2)(i). The Treasury Regulations contain a non-exclusive list of mitigating factors:

> The mitigating factors include, but are not limited to . . . (2) The fact that the filer has an established history of complying with the information reporting requirement with respect to which the failure occurred. In determining whether the filer has such an established history, significant consideration is given to—(i) Whether the filer has incurred any penalty under § 301.6721 . . . in prior years for the failure . . . .

*Id.* § 301.6724-1(b).

The Debtor squarely fits within the mitigating factors contemplated by the Treasury Regulations. The Debtor has an established history, albeit brief, of timely filing its Partnership Returns and has not been penalized before due to not complying with the IRC. *Id.* § 301.6724-1(b)(2). The Treasury Regulations explicitly list such circumstances as mitigating factors. *Id.* Furthermore, the first time the Debtor did not file its returns coincided with the first year the SPhinX Group stopped sending investors Schedule K-1s and filed for liquidation—the very events this Court found qualify as impediments. Based on the totality of the circumstances, the Court holds that there are significant mitigating factors with respect to the Debtor's failure to file. *See* IRM

20.1.1.3.2 (Nov. 25, 2011) ("Reasonable cause is based on all the facts and circumstances in each situation and allows the IRS to provide relief from a penalty that would otherwise be assessed.").

### 3. Responsible manner

The Debtor contends that it acted in a responsible manner by making concerted efforts to obtain the information necessary to prepare its Partnership Returns.  On many occasions, the Debtor contacted the Liquidators for SMFF's Schedule K-1 and other information relating to the Liquidation Issues.  The Debtor emphasizes that it closely monitored the SPhinX Group liquidation proceedings and reviewed the financial information provided on its website to determine if sufficient information existed to prepare its Partnership Returns.

The IRS asserts that the Debtor did not act in a responsible manner because a reasonable prudent person under the circumstances would have done far more to avoid or mitigate the failure to file.  For example, the Debtor could have sought out additional tax advice to work through the Liquidation Issues and requested extensions of time to file for tax years 2007 and 2008.[11]  The IRS's chief criticism was that the Debtor did not submit Partnership Returns using the information it had available—the NAVINC Files and the Summary Financial Data.  At the Trial, the IRS suggested that the Debtor could have used this information to submit its Partnership Returns with a disclosure indicating that the filing was based on the best available information.

In addition to showing that there were significant mitigating factors or impediments, a filer must also prove it acted in a responsible manner both before and after the failure occurred.  Treas. Reg. § 301.6724-1(a).  Acting in a responsible manner

_____

[11] The parties acknowledged that the Debtor filed an extension in 2006.

means "(i) that the filer exercised reasonable care, which is that standard of care that a reasonably prudent person would use under the circumstances in the course of its business in determining its filing obligations, and that the (ii) filer undertook significant steps to avoid or mitigate the failure." *Id.* § 301.6724-1(d)(i).

Under these circumstances, the Debtor essentially had two available options in determining its filing obligations: it could either file its Partnership Returns based on the information it had, or it could continue to request from the Liquidators the information necessary to file its own Partnership Returns.[12]  Both of these avenues, however, presented serious challenges for the Debtor.  The Debtor thoroughly explored both of these options before deciding it should continue to try to obtain more accurate information.

The record reflects that the Debtor had serious concerns over filing with the information it had on hand.  The Debtor was on notice that it did not have accurate information with which to prepare its Partnership Returns: the Liquidators repeatedly advised SMFF investors as early as 2006 that SPhinX Group's accounting records should not be relied upon; Mr. Butt, the President of the Debtor's general partner, testified that he knew there were likely fundamental allocation issues with the NAVINC Files because they did not account for the Preference Settlement;[13] the Liquidators submitted interim reports with the Grand Court observing that they uncovered material accounting errors with SPhinX Group's books; and the rights attaching to the S-Shares, which essentially constituted the value of the Debtor's investment in SMFF, remained unknown until

---

[12] This may seem like an overly simplistic way of setting forth the Debtor's options because they amount to a binary decision—either file or don't file—which is a decision always before a taxpayer.  The decision before the Debtor, however, was a bit more nuanced as is discussed more fully below.

[13] The IRS admitted that it also could not determine SMFF's allocation among the SPhinX Group funds because of uncertainties surrounding the Preference Settlement.

2013.[14]  Based on this knowledge, a reasonable person would likely be concerned with signing the jurat clause at the bottom of Form 1065, which provides in relevant part, that "[u]nder penalties of perjury, I declare that I have examined this return . . . and to the best of my knowledge and belief, it is true, correct, and complete."  To the best of the Debtor's knowledge, the information it had to prepare the Partnership Returns was inaccurate.  Such knowledge also posed other valid concerns for the Debtor.

By knowingly filing inaccurate returns, the Debtor had a reasonable cause for concern given the specter of accuracy-related penalties it might incur under the IRC.  The Debtor faced potential penalties for negligently filing inaccurate returns.  *See generally* I.R.C. §§ 6662, 6662A, 6664.  Furthermore, as a partnership with approximately 1,600 investors, the Debtor was responsible for preparing Schedule K-1s for its investors.  With inaccurate information, the Debtor would invariably have had to amend its Partnership Returns, which in turn, would echo some 1,600 times over with its investors amending their own returns.  While assuredly this would be an imposition on its investors, the Debtor, as a preparer and disseminator of Schedule K-1s, also risked prosecution for preparing inaccurate Schedule K-1s for use by its investors.  *See generally* I.R.C. §§ 6694 (imposing penalties on tax return preparers), 7701 (defining a tax return preparer); *Goulding v. United States*, 717 F. Supp. 545, 551 (N.D. Ill. 1989) (holding that "income tax preparer" includes preparing entries on a Schedule K-1 for entry on a limited partner's return), *aff'd*, 957 F.2d 1420 (7th Cir. 1992).  A reasonable prudent partnership under these circumstances would rightfully be reluctant to file its Partnership Returns.

---

[14] The S Share issue was settled among the Liquidators and certain Sphinx Group investors in November 2013.  The IRS agreed that there were issues with ascertaining the value of the S Shares.  The IRS testified that there were "many uncertainties" surrounding the S-Shares and nobody "actually knew what they were."

Instead of filing with the information it had, the Debtor decided that the more prudent course of action was to try to obtain better information from SMFF.  Both before and after the Debtor failed to file its Partnership Returns, the Debtor undertook steps to avoid or mitigate the failure by attempting to obtain SMFF's Schedule K-1.  As early as January 2006, Mr. Butt sought to obtain SMFF's Partnership Returns from a variety of parties; for instance, he contacted PwC, the SPhinX Group's auditor; Plus Funds, the investment manager of the SPhinX Group; and Bisys, SMFF's auditor.  Likewise, after SPhinX Group entered liquidation, William Sugden, the Debtor's counsel, was in contact with the Liquidators, via email and in person, in an effort to obtain SMFF's Schedule K-1 and answers to certain Liquidation Issues.  The Debtor also filed an extension to file its 2006 Partnership Returns.  Although the Debtor did not file extensions for years 2007 and 2008, Mr. Sugden candidly testified that the Debtor decided not to file these extensions because the Debtor had no intention to file its Partnership Returns given the Liquidators' steadfast refusal to send investors a Schedule K-1.

Ultimately, the inquiry under the responsible manner standard is not whether the Debtor undertook, or even considered, every conceivable option; rather, it is whether the Debtor exercised reasonable care under the circumstances.[15]  Based on the evidence presented, the Debtor proved that it carefully considered its filing obligations and undertook appropriate steps in an effort to avoid the failure.  Accordingly, the Court

---

[15] The Court does not accept the proposition that the Debtor acted unreasonably because it did not submit Partnership Returns with a disclosure.  It seems illogical to consider under the "responsible manner" analysis whether a filer submitted a return.  The failure-to-file waiver statutes, such as IRC sections 6724(a) and 6698(a)(1), are only implicated when a taxpayer does *not* file a return.  Where a return is filed, these statutes are inapplicable.  It is circular, and therefore improper, to consider that the taxpayer did not file a return when determining whether a taxpayer exercised reasonable care.  Indeed, these waiver statutes would serve no purpose if the failure to file a return (with or without a disclosure) demonstrated a lack of reasonable care.  The Court also disagrees that the Debtor acted irresponsibly by not seeking additional tax advice.  The record reflects that the Debtor had and relied upon tax advice throughout the period in question from a major U.S. law firm.

holds that the Debtor acted in a responsible manner both before and after the failure to file occurred.

**B.  "Willful Neglect" Under 26 U.S.C. § 6724(a)**

The parties agree that this is not a case of a taxpayer failing to file a return due to willful neglect.  The Court agrees.  In *United States v. Boyle*, the Supreme Court interpreted "willful neglect" to mean a "conscious, intentional failure or reckless indifference."  469 U.S. 241, 245 (1985).  The Court further elaborated that "willful neglect" requires a taxpayer to prove that the failure to file "was the result neither of carelessness, reckless indifference, nor intentional failure."  *Id.* at 247 n.4.

Nothing in the record shows that the Debtor's failure to file resulted from carelessness or recklessness.  The Debtor was fully aware of its filing obligations and took steps to comply with the tax laws.  As discussed above, the Debtor reasonably declined to rely on the NAVINC Files and the Summary Financial Data.  And the Debtor made repeated efforts to obtain the necessary information from the Liquidators to file its Partnership Returns.  The Court therefore concludes that the Debtor has shown that the failure to file its Partnership Returns was not the result of willful neglect.

### IV.  CONCLUSION

For all these reasons, the Court will sustain the Objection.  An appropriate order will issue.

**BY THE COURT**:

Dated: August 2, 2016
Wilmington, Delaware

_____
Brendan Linehan Shannon
Chief United States Bankruptcy Judge